**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| RHODIA INC., | : | |
| Plaintiff, | : | Civ. No. 04-6424 (GEB) (MF) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| BAYER CROPSCIENCE INC., | : | |
| AVENTIS S.A., and SANOFI-AVENTIS | : | |
| S.A., | : | |
| Defendants. | : | |
| | : | |
| | : | |

**BROWN, Chief Judge**

  This matter comes before the Court upon: (1) the motion of defendants Aventis S.A.

("Aventis") and Sanofi-Aventis, S.A. ("Sanofi") to dismiss and compel arbitration pursuant to 9

U.S.C. § 201, and in the alternative to dismiss pursuant to Rule 12(b)(6); (2) the motion of

defendant Bayer CropScience Inc. ("Bayer") to dismiss pursuant to Federal Rule of Civil

Procedure 12(b)(6); and (3) the motion for partial summary judgment filed by Plaintiff Rhodia

Inc. ("Rhodia").  This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and §

1332.  The Court has considered the parties' submissions and decided the matter without oral

argument, pursuant to Federal Rules of Civil Procedure Rule 78.  For the reasons set forth below,

the Court will: (1) grant Aventis and Sanofi's motion to compel arbitration; (2) grant in part and

deny in part Bayer's motion to dismiss; and (3) deny Rhodia's motion for partial summary

judgment.  The case will be stayed pending resolution of the issues referred to arbitration.

## I.        BACKGROUND

This case involves a dispute over the costs related to the investigation and remediation of environmental damage on an 800-acre former elemental phosphorus production site in Silver Bow County, Montana ("Silver Bow Site").  The production of elemental phosphorus at the Silver Bow Site ceased in March 1997.  Compl. ¶ 12.  Plaintiff Rhodia, a Delaware corporation with its principal place of business in Cranbury, New Jersey, acquired the Silver Bow Site from Rhone-Poulenc Inc. ("RPI") pursuant to an Asset Contribution Agreement ("ACA"), dated January 1, 1998.  Compl. ¶¶ 2, 14.  The legal successor to RPI is Defendant Bayer, a New York corporation with its principal place of business in Research Triangle Park, North Carolina. Compl. ¶ 6.  At the time of Rhodia's acquisition of the Silver Bow site, both Rhodia and RPI were controlled by Rhone-Poulenc S.A. ("RPSA").  Compl. ¶¶ 10-11.  Aventis, a French corporation with its principal place of business in Strasbourg, France, became the legal successor to RPSA in December 1999.  In December 2004, Aventis merged into and with Sanofi, a French corporation with its principal place of business in Paris, France.  Compl. ¶¶ 7, 8, 10.

Since acquiring the Silver Bow Site in 1998, Rhodia has incurred substantial costs related to its ongoing investigation and remediation of the Silver Bow Site.  Compl. ¶¶ 27.  In June 2000, the Environmental Protection Agency ("EPA") issued an administrative order against Rhodia under Section 7003 of the Resource Conservation and Recovery Act ("RCRA"), requiring the stoppage of environmentally damaging elemental phosphorus leaks at the Silver Bow Site.  Compl. ¶¶ 15-17.  On December 22, 2003, the EPA issued a Corrective Action Order on Consent to Rhodia, requiring additional environmental clean-up at the Silver Bow Site. Compl. ¶¶ 18-20.  On January 12, 2004, Rhodia agreed to a Montana Department of

2

Environmental Quality demand to remove elemental phosphorus contamination at the Silver

Bow Site. Compl. ¶¶ 21-22.  In May 2004, the EPA issued another administrative order requiring

the excavation and removal of sections of a wastewater discharge pipe and the remediation of

identified soil pollution at the Silver Bow Site.  Compl. ¶¶ 23-25.   All of these actions are

related to the release of waste when the Silver Bow Site was owned by RPI.  Compl. ¶¶ 15-26.

Additionally, in 2004, Rhodia pled guilty to criminal charges and paid over $16 million in

criminal fines related to environmental violations on the Silver Bow Site.  Compl. ¶¶ 26.

Rhodia's Amended Complaint asserts seven claims.  The first claim seeks cost recovery

pursuant to CERCLA § 107, and the second claim seeks contribution under the same section.

The third claim seeks contribution under CERCLA § 113(f)(3)(B).  The fourth claim seeks

contribution under federal common law.  In the fifth claim, Rhodia seeks declaratory relief

pursuant to CERCLA § 113(g)(2) and 28 U.S.C. § 2201.  The sixth claim is for common-law

negligence and the seventh claim is for common-law indemnity.  All of the claims concern

environmental damage on or around the Silver Bow Site.

## II.    DISCUSSION

### A.    Aventis and Sanofi's Motion to Dismiss and Compel Arbitration.

#### 1.    Standard of Review

A motion to compel arbitration is reviewed under the summary judgment standard set

forth in FED.R.CIV.P. 56(c).  See Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54

n. 9 (3d Cir. 1980) ("Application of [the summary judgment] standard to [arbitration

determinations] is appropriate inasmuch as the district court's order to arbitrate is in effect a

summary disposition of the issue of whether or not there had been a meeting of the minds on the

agreement to arbitrate."); Bellevue Drug Co. v. Advance PCS, 333 F. Supp. 2d 318, 322 (E.D.

Pa. 2004) ("[m]otions to compel arbitration are reviewed, in the first instance, under the

well-settled summary judgment standard set forth in FED.R.CIV.P. 56(c)").

A court should grant a summary judgment motion if "there is no genuine issue as to any

material fact and . . . the moving party is entitled to a judgment as a matter of law."

FED.R.CIV.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Orson, Inc. v.

Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).  In deciding whether triable issues of

fact exist, the court must view the underlying facts and draw all reasonable inferences in favor of

the non-moving party.  See Hancock Indus. v. Schaeffer, 811 F.2d 225, 231 (3d Cir. 1987).  In

arguing against a motion for summary judgment, "an adverse party may not rest upon the mere

allegations or denials of the adverse party's pleading, but the adverse party's response . . . must

set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).

### 2. The Environmental Indemnity Agreement and the Termination Amendment

In moving to compel arbitration, Aventis and Sanofi argue that pursuant to the

Termination Amendment ("Termination Amendment") to the Environmental Indemnity

Agreement ("EIA"), Rhodia has released the claims asserted in the Complaint.   Both the

Termination Amendment and the EIA state that French law shall control their interpretation.  The

Termination Amendment provides:

> RHODIA irrevocably waives any and all Claims as defined in the Environmental
> Agreement (hereinafter, "the Claim"), which have arisen or shall arise, of which it
> has been notified or not, against AVENTIS and/or its Affiliates . . . and
> successors.  More generally, Rhodia irrevocably waives all legal action and
> proceedings against AVENTIS . . . of which the Environmental Agreement is the

4

subject, cause or consequence."

Friedman Decl. Ex. C (Termination Amendment) at 3.  The EIA defines "Claim" as: "(i) any request by a third party for redress of some damage suffered as a result of the polluting of a Site or (ii) any administrative injunction to undertake treatment–with the exception of treatment works performed during or at the end of production operations–remedial, containment, restructuring or monitoring works as a result of polluting of a Site."  Friedman Decl. Ex. B (EIA) at 4-5.

Aventis and Sanofi contend that the present claims were released in the Termination Amendment, because Rhodia's Complaint involves "Claims," as defined by the EIA.   Aventis Br. at 13.  As support for their interpretation of the Termination Amendment as a release of these claims, Aventis and Sanofi claim that, in a November 6, 2003 memorandum, Rhodia acknowledged that its current claims constituted "Claims" under the EIA and the Termination Amendment.  Id.  Rhodia disagrees and argues that the Termination Amendment only releases Aventis and Sanofi from claims to "which the Environmental Agreement is the subject, cause or consequence."  Pl. Br. at 48 n.25.  Rhodia contends that this includes only those claims "created by the EIA," not statutory and common law claims.  Id. at 47-48 n.25.

The Court does not determine whether, under the controlling French law, the Termination Amendment acts as a release of the Rhodia's statutory and common law claims, because, as explained below, the Court concludes that this dispute must be referred to arbitration.

The EIA contains a clause that requires "[a]ny dispute that should arise concerning the validity, interpretation or performance of this agreement must undergo the [arbitration] procedure

described in paragraphs 8.3 through 8.5." EIA at 9.[1]  Aventis and Sanofi argue that to extent that

Rhodia disputes that the Termination Amendment provided a release, that dispute must be

arbitrated because it "concern[s] the validity, interpretation or performance of" the EIA and the

Termination Amendment.  Aventis Br. at 14.  Aventis and Sanofi also argue that any dispute over

scope of the arbitration clause itself concerns the "validity, interpretation or performance of" the

EIA.  Aventis Reply Br. at 6.  Rhodia argues that the present dispute does not concern "the

validity, interpretation or performance" of the EIA.  Pl. Br. at 46.  Rhodia also claims that the

Court must analyze the scope of the EIA and Termination Amendment and that French law

requires a holding that Rhodia's claims are "not comprehended by the EIA" or the Termination

Amendment. Id. at 48.

### 3. Applicable Law

Aventis and Sanofi bring their motion to compel arbitration pursuant to 9 U.S.C. § 201,

which provides that the "Convention on the Recognition and Enforcement of Foreign Arbitral

Awards of June 10, 1958 [("Convention")], shall be enforced in the United States courts in

accordance with this chapter."  9 U.S.C. § 201.  Article II, Paragraph 3 of the Convention

provides that the Court "when seized of an action in a matter in respect to which the parties have

made an agreement . . . shall, at the request of one of the parties, refer the parties to arbitration,

---

[1]The text of the Termination Amendment does not contain a separate arbitration
agreement and the Termination Amendment states that "[t]he Environmental Agreement is
terminated in its entirety as of the date of these documents."  The Termination Amendment also
states that "it voids and replaces all prior agreements, undertakings and discussions–written or
oral–between the Parties."  Rhodia does not argue that the Termination Amendment cancels the
agreement to arbitrate disputes involving the EIA.  Indeed, "when parties have agreed to a broad
arbitration clause, the duty to arbitrate survives termination of the agreement if the dispute arises
under the expired agreement."  Nibbs v. Felix, 726 F.2d 102, 104 (3d Cir. 1984).

unless it finds the said agreement null and void, inoperative or incapable of being performed."

It is axiomatic that, since, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983), "a very strong presumption in favor of arbitration of international disputes [exists], even where U.S. statutory claims are implicated," Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 626-27 (1985), and-in view of the interests of judicial economy-the issue whether or not an arbitration should be compelled is always resolved first. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 283 (1995).[2] Of course, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960). "Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT & T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 649 (1986). Nonetheless, the Court's "function . . . is very limited when the parties have agreed to submit all questions of contract interpretation to the arbitrator. [The Court] is confined to ascertaining whether the party seeking arbitration is making a claim which on its face is governed by the contract." Medtronic Ave, Inc. v. Advanced Cardiovascular Systems, Inc., 247 F.3d 44, 55 (3d Cir. 2001) (internal citations omitted). "Whether the moving party is right or wrong is a question of contract interpretation for the arbitrator. In these circumstances the

---

[2]The domestic FAA (chapter 1 of the FAA) "is applicable to actions brought under the Convention (chapter 2 of the FAA) to the extent they are not in conflict." China Minmetals Materials Import and Export Co., Ltd. v. Chi Mei Corp., 334 F.3d 274, 280 (3d Cir. 2003) (citing 9 U.S.C. § 208).

moving party should not be deprived of the arbitrator's judgment, when it was his judgment and all that it connotes that was bargained for." United Steelworkers, 363 U.S. at 568.

In deciding whether a dispute must be submitted to arbitration, the Court analyze two questions: (1) whether an agreement to arbitrate exists; and (2) whether the dispute falls within the scope of the agreement. PaineWebber Inc. v. Hartmann, 921 F.2d 507, 511 (3d Cir. 1990). "If the court determines that there is an agreement to arbitrate and that the issue in dispute falls within the scope of the agreement, it must submit the matter to arbitration without ruling on the merits of the case." Medtronic, 247 F.3d at 55.[3]

If the Court concludes that an arbitration agreement exists between the parties, a presumption of arbitrability arises and the Court must allow arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Id. (quoting United Steelworkers, 363 U.S. at 582-83). "Positive assurance" does not require complete certainty. See PaineWebber, 921 F.2d at 513 ("a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt"). Indeed, "[s]o long as the [the] claim of arbitrability was plausible, interpretation of the contract should have been passed on to the arbitrator." Sharon Steel Corp. v. Jewell Coal and Coke Co., 735 F.2d 775, 778 (3d Cir. 1984). When determining whether a given claim falls within the scope of an arbitration agreement, a court must "focus . . . on the factual underpinnings of the claim rather than the legal theory alleged in the complaint." Medtronic, 247 F.3d at 55 (citations omitted). "[I]nsofar as the allegations underlying the statutory claims touch matters covered by"

---

[3] Rhodia insists that "[a]n affirmative defense like a release is not a proper basis for a motion to dismiss." Pl. Br. at 47 n.24. On this motion, the Court is not determining the merits of the affirmative defense.

the arbitration agreement, the Court should "resolve[] any doubts in favor of arbitrability."

Mitsubishi Motors, 473 U.S. at 624-25 n.13 (1985); see also Varallo v. Elkins Park Hosp., 63

Fed.Appx. 601, 603 (3d Cir. 2003) (finding that allegations that "touch matters" covered by the

parties' contract must be arbitrated, "whatever the legal labels attached to them").

      **4.**      **Rhodia's Claims Against Aventis and Sanofi Must be Referred to Arbitration.**

First, the Court finds that an arbitration agreement exists between the parties.   As

described above, the EIA contains an arbitration clause.  Rhodia does not dispute this.

Second, the Court cannot conclude with "positive assurance" that the arbitration clause

does not cover this dispute.  Although, Rhodia appears to argue that the Court must limit its

consideration to whether the legal theories in the Complaint concern the "validity, interpretation

or implementation" of the EIA (Pl. Br. at 46), the Court disagrees.  The "focus is on the factual

underpinnings of the claim rather than the legal theory alleged in the complaint." Medtronic, 247

F.3d at 55 (citations omitted). The facts underlying the claims involve Aventis and Sanofi's

alleged liability for cleanup costs related to the contamination of the Silver Bow Site, and a

contract allegedly providing for the release of "Claims" for "Direct Damages."  Rhodia also

argues that the Court must perform "a detailed analysis of the claims and whether they were

comprehended by the release." Pl. Br. at 47-48.  But as described above, the Court must only

decide whether it can determine with "positive assurance" that the dispute is not covered by the

arbitration agreement.[4]  The Court cannot do so.  The arbitration clause requires questions of

_____

      [4]Rhodia argues that under French law, the claims in the Complaint are beyond the scope of the arbitration agreement.  In support of their argument, Rhodia has submitted a declaration from a French law professor arguing that French law limits the applicability of the release to contractual indemnification rights created by the EIA.  Pl. Br. at 50.  Aventis and Sanofi counter,

contract interpretation to be submitted to the arbitrator.  Thus, the Court "is confined to

ascertaining whether the party seeking arbitration is making a claim which on its face is governed

by the contract."    Medtronic, 247 F.3d at 55.  Aventis and Sanofi are making an argument that,

on its face, is governed by the EIA.  The claims in the Complaint may constitute "Claims," as

defined in the EIA and released in the Termination Amendment. [5]

> Rhodia also argues that the "logical end" of this holding would be "that all a defendant

need do is assert (i) that a plaintiff's claims were released; and (ii) that disputes regarding the

scope of the release are subject to arbitration, and courts would have to defer to arbitration panels

to determine whether it is so."  Pl. Br. at 48.   The Court is not convinced.  In order to succeed on

a motion to compel arbitration, the Court must conclude that an arbitration agreement exists and

that a plausible interpretation of the agreement requires arbitration.  Sharon Steel, 735 F.2d at

778.  This standard plainly requires more than mere assertions that the claims are released and

that the scope of the release is subject to arbitration.

> For the above reasons, under the authority of 9 U.S.C. § 206, the Court orders that the

---

with the support of their own French law expert, that the dispute is within the scope of the
arbitration agreement because they are "Claims" for "Direct Damages." Of course, an arbitrator
with a background in French law is likely to be in a better position to decide the merits of such
arguments than is a federal judge or a jury.

[5]Counsel for Aventis and Sanofi notified the Court, by letter dated September 20, 2006,
that an arbitration between the parties in France had ended and "the arbitrators ruled in a final
award that Rhodia S.A.'s environmental claims are barred by its release of these claims in the
parties' [Termination Amendment]."  Counsel for Rhodia informed the Court, by letter dated
September 22, 2006, that "the arbitration panel simply did not address the scope of the release
contained in the Settlement Agreement and whether it extends merely to contractual claims . . . or
to all claims . . .  nor did it address whether the scope of the arbitration clauses in either that
agreement or in the [EIA] is limited to contractual claims . . . or extends to all claims."  The
Court notes that referral to arbitration here will help to assure consistent interpretations of the
Termination Amendment and the Environmental Indemnity Agreement (EIA).

issue of whether the claims against Aventis and Sanofi were released or waived is referred to arbitration, pursuant to the procedures set forth in the EIA.

"[T]he plain language of § 3 [of the Chapter 1 of the FAA] affords a district court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration." Lloyd v. Hovensa, LLC., 369 F.3d 263, 269 (3d Cir. 2004).[6]  Here, Aventis and Sanofi have not asked for a stay, but a dismissal.  If all the claims in an action are arbitrable, a court may dismiss the action instead of staying it.  Capers v. Quest Capital Strategies, Inc., No. 06-5780 (SDW), 2007 WL 2033831, at *4 (D.N.J. July 10, 2007) (citing Blair v. Specialty Gases, 283 F.3d 595, 600 (3d Cir. 2002)).  That is not the case here.  Here, there is no agreement to arbitrate between Bayer and Rhodia, but Rhodia's claims against Bayer are intertwined with Rhodia's claims against Aventis and Sanofi.   "Courts typically grant stays when there are both arbitrable and non-arbitrable claims in the same action and significant overlap exists between the parties and the issues."  Capers, 2007 WL 2033831, at *4 (citing  Miron v. BDO Seidman, 342 F. Supp. 2d 324, 334 (E.D. Pa. 2004).  Therefore, the Court will exercise its discretion and stay the proceedings.

The case will be administratively terminated.  Rhodia has leave to bring a motion before the Court, upon the resolution of the issues referred to arbitration to restore this matter to the active docket.

### B.      Bayer's Motion to Dismiss

#### 1.      Standard of Review

---

[6]Both Chapter 2 of the FAA and the Convention are silent as to whether the Court should dismiss or stay an action after referring it to arbitration.

In considering a Rule 12(b)(6) motion to dismiss, a court "must accept all well pleaded allegations in the complaint as true and view them in the light most favorable to plaintiff." Angelastro v. Prudential-Bache Sec., Inc., 764 F.2d 939, 944 (3d Cir.), cert. denied, 474 U.S. 935 (1985).  A complaint will survive a motion under Rule 12(b)(6) if it states plausible grounds for plaintiff's entitlement to the relief sought. Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965-66 (2007) (abrogating the Conley standard that the "complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"). In other words, it must contain sufficient factual allegations to raise a right to relief above the speculative level. Id. at 1965.  The issue before the Court "is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims." Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1420 (3d Cir. 1997) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

Generally, a court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).  A court may do so, however, if the document is integral to or explicitly relied upon in the complaint, without converting the motion into one for summary judgment. Id. This exception is based on the rationale that the primary problem raised by considering documents outside the complaint - lack of notice - does not apply where the plaintiff has actual notice and has relied on the documents in framing the complaint.  Id.

## 2.    The Asset Contribution Agreement[7]

---

[7]The Court will consider the ACA on the motion to dismiss because the Complaint expressly relies on the document.  See Compl.  ¶ 14.  Rhodia has neither contested its consideration nor its authenticity.  While the parties have submitted to the Court two copies of

Bayer argues that two sections of the ACA require dismissal.  Bayer argues that in

Section 2.1 of the ACA, Rhodia not only agreed to indemnify it, but also to "assume . . . all of the

liabilities and obligations of RPI relating to the Acquired Assets and the Business."[8]   Bayer

argues that "Rhodia therefore effectively released any claim against RPI, and through it Bayer

CropScience, related to Silver Bow."  Bayer also argues that in Section 7.3, Rhodia agreed to

indemnify it for the claims it now brings.[9]  Rhodia counters that Bayer is asserting an affirmative

---

the Asset Contribution Agreement (ACA) bearing different dates (Ex. A to the Friedman
Declaration purports to be the ACA, dated 1/1/98; Ex. 1 to the Llewellyn Declaration purports to
be the ACA, Amended and Restated as of 6/1/98), as the parties have not addressed the issue, the
Court assumes that any differences do not matter to the Court's analysis.

[8]        Section 2.1 of the ACA states, in relevant part:
Assumed Liabilities. (A) Subject to the terms and conditions of this Agreement, upon the transfer
of the Acquired Assets at the Closing, Rhodia shall assume, agree to pay, perform, discharge and
indemnify RPI against, and otherwise be responsible for, all of the liabilities and obligations of
RPI relating to the Acquired Assets . . .  and the Business, of any kind, character or natures
whatsoever, whether known or unknown, accrued, absolute, contingent, liquidated . . . including,
without limitation, the following (together with the liabilities described in Section 2.2, the
"Assumed Liabilities"):
        (i) subject to Section 3.3, any and all obligations under the Assigned Contracts arising in
the operation of the Business,
        (ii) subject to Section 3.3, any liability or obligation arising under or relating to any of the
Assigned Contracts to the extent attributable to breaches occurring . . . prior to or after the date
hereof;
        (iii) any indebtedness of RPI for borrowed money relating to the Business;
        (iv) any liability or obligation with respect to any litigation, investigation or other
proceeding pending or threatened in respect of the Business on or prior to the date hereof or
subsequently asserted with respect to events or omissions which occurred on or prior to the date
hereof giving rise to a cause of action; and
        (v) any liability or obligation relating to any period prior to or including the date hereof to
any employee of RPI or any third party arising by reasons of a claim that the execution and
delivery of this Agreement or the consummation of the transactions contemplated hereby (x)
constitutes breach . . ., or (y) violates any rights of any such employee.
Friedman Declaration Ex. A ("ACA") at 8-9.

[9]Section 7.3 states, in relevant part:
Indemnification by Rhodia. . . . Rhodia shall indemnify RPI and its officer and directors for, and

defense that is meritless as a matter of New York law, which governs the ACA.  Rhodia also argues that Section 2.1 does not contain the words "release" or "claim" and that no language in the ACA suggests a release.

The Court determines that New York law should guide its interpretation of the ACA.  The ACA provides that its terms are to be governed by the law of the state of New York and both parties have briefed only New York law in this regard.   Moreover, the Third Circuit has ruled that private agreements "addressing the allocation of responsibility for CERCLA claims are to be interpreted by incorporating state, not federal, law."  Hatco Corp. v. W.R. Grace & Co.-Conn., 59 F.3d 400, 405 (3d Cir. 1995).

Neither party disputes the fact that Section 7.3 is an agreement for the indemnification of liabilities.   New York law requires that "an indemnity agreement be strictly construed and that a clear and unmistakable intent to indemnify be manifested in the contract."  Hatco, 59 F.3d at 405 (citing Heimbach v. Metropolitan Transp. Auth., 553 N.E.2d 242, 246 (N.Y. 1990)); see also Horsehead Industries, Inc. v. Paramount Communications, Inc., 258 F.3d 132, 144 (3d Cir. 2001) ("in New York[,] indemnification agreements are strictly construed; a court cannot find a duty to indemnify absent manifestation of a 'clear and unmistakable intent' to indemnify") (internal citations omitted).

---

shall hold them harmless from, any and all damages, losses, obligations, liabilities, claims, costs and expenses, including without limitation, attorney's fees, court costs, interest and penalties (collectively, "Liabilities") asserted against or incurred or sustained by any of them relating to or arising out of (i) any breach of any covenant or agreement contained in this Agreement . . . ; (ii) any breach of any of the warranties or representations set forth in Article 4 hereof . . .; (iii) any of the Assumed Liabilities; (iv) Liabilities arising out of or relating to the Business and the Acquired Assets; and (v) any of the taxes and costs payable by Rhodia.
ACA at 19.

The parties disagree as to whether Section 2.1 should be construed as an indemnification or a release.  The distinction between a release and an indemnification is meaningful, in part because New York law requires that when the language of a release is general in nature, the release is to be construed strongly against the releasor. Hatco, 59 F. 3d at 406 n.4; Mt. Read Terminal, Inc. v. LeChase Const. Corp., 58 A.D.2d 1034, 1035 (N.Y. App. Div. 1977) ("[w]hen the words of the release are of general effect the release is to be construed most strongly against the releasor").  "The fact that the release contains a clause setting forth a specific recital is not dispositive of the construction to be given the instrument." Mt. Read Terminal, 58 A.D.2d at 1035.  "A release is a contract that, unless its language is ambiguous, must be interpreted to give effect to the intent of parties as indicated by the language they utilized." J & A Bayly Const. Co. Inc. v. Village of Castleton-on-Hudson, 248 A.D.2d 766, 767 (N.Y. App. Div. 1998).

"To constitute a release, a writing must contain an expression of a present intention to renounce a claim." Hatco, 59 F.3d at 406 (internal citations omitted).  "No particular form need be used" and "any words maybe used as long as they manifest the releasor's intent to discharge." Id. at 405 (internal citations omitted).

Here, the language of Section 2.1 provides that Rhodia assumed liabilities from RPI.  An assumption of liability is different than an indemnification.  "[O]ne who assumes liability, as distinguished from one who agrees to indemnify against it, takes the obligation of the transferor unto himself." Id. (internal citations omitted).  As in Hatco, the agreement here, if enforceable, acts to relieve Bayer from payments for matters that Rhodia took over. Id. at 406.  The provision indicates a present intention to renounce claims because it "prevents a purchaser from asserting [those claims] against the seller." See id.  Therefore, the Court will construe Section 2.1 as a

15

release.[10]

### a.   Section 2.1 of the ACA Encompasses Rhodia's CERCLA and Common Law Contribution Claims.

Under New York law, the broad language in Section 2.1 encompasses the CERCLA and federal common law contribution claims made by Rhodia.[11]   Section 2.1 provides that "Rhodia shall assume . . . *all of the liabilities* and obligations of RPI relating to the Acquired Assets and the Business, of any kind, character or nature whatsoever . . . *including, without limitation*, the following."  ACA at 8 (emphasis added).  Rhodia does not contend that its CERCLA claims do not relate to the Acquired Assets and the Business.[12]   Instead Rhodia argues that the assumption applies only to liabilities owed to third parties.  Rhodia claims that the Court should limit the broad assumption language to liabilities similar to those specifically recited in the ACA.  The Court disagrees.  The Court finds that the language of Section 2.1 is unambiguous and that it expressly provides that the recited liabilities are included "without limitation" to the assumption of all liabilities.  Therefore, the Court concludes that Rhodia assumed all the liabilities of RPI

---

[10]Bayer's citation to <u>Rajbir & Sahsa Sandhu Trust v. Sandhu Inc.</u>, No. 02-2205, 2003 U.S. App. LEXIS 16126 (3d Cir. Aug. 6, 2003) and <u>Booth v. 3669 Delaware, Inc.</u>, 703 N.E. 2d 757 (N.Y. 1998) are unhelpful because both cases involve language expressly providing for "release."

[11]CERCLA is strict liability statute.  <u>Tippins Inc. v. USX Corp.</u>, 37 F.3d 87, 92 (3d Cir. 1994).  Similarly, Rhodia's claims for federal common law contribution and declaratory judgment are based on strict liability because they are dependent on the alleged CERCLA liabilities.  <u>See</u> Compl. ¶¶ 47, 51.  Rhodia's claims based on negligence are discussed separately below.

[12]Section 2.3 of the ACA excludes certain of Bayer's liabilities from assumption and indemnification.  One of the excluded liabilities is thirty percent (30%) of RPI's obligations with respect to the Shared Liabilities.  Section 2.2 defines Shared Liabilities as those "which relate to and were incurred in connection with the Business and the agricultural chemical and animal nutrition business of RPI, as more particularly described on Schedule 2.2."  This schedule was not submitted to the Court.  The Court assumes that this is not germane to the Court's analysis.

relating to the Acquired Assets, including the environmental liabilities asserted in Rhodia's Complaint.

This conclusion is consistent with the holdings of other courts.  For example, in Olin Corp. v. Consolidated Aluminum Corp., 5 F.3d 10 (2d Cir. 1993), the Second Circuit concluded that under New York law, a clause containing language similar to that in Section 2.1 of the ACA was broad enough to encompass CERCLA claims between the parties to the agreement.  Olin involved a dispute between Conalco, the owner of an aluminum plant, and Olin, the plant's previous owner.  Olin refused to voluntarily contribute for environmental cleanup costs and filed a declaratory judgment action.  Conalco filed a counterclaim seeking relief pursuant to CERCLA. Olin moved for partial summary judgment, and the district court dismissed the counterclaim.  On appeal, the Olin court examined language from three agreements between the parties: a Purchase Agreement, an Assumption Agreement and a Release.  The Purchase Agreement stipulated that "Conalco shall assume . . . and indemnify Olin against, all liabilities, obligations and indebtedness of Olin related to the [assets at issue]."  Id. at 10.  Similarly, the Assumption Agreement stated that "Conalco hereby assumes and agrees to . . . indemnify Olin against all liabilities (absolute or contingent, obligations and indebtedness of Olin related to the [assets at issue]."  Id. at 13.  The Olin court concluded that "[t]he language evidences the parties' 'clear and unmistakable intent' that [Defendant] indemnify [Plaintiff] for all liabilities related to the . . . site." [13]  Id. at 16.  Therefore, the court affirmed the dismissal of the CERCLA counterclaim. Id.; see also A-C Reorganization Trust v. E.I. DuPont De Nemours & Co., No. 94-C-574, 1997

---

[13]The Olin court stated that "although we analyze all three agreements, the language in the Purchase Agreement and Assumption Agreement is sufficient to support our holding."  5 F.3d at 13 n.2.

WL 381962, at *5-6 (E.D. Wis. March 10, 1997) (holding that under New York law, an agreement to assume and to pay for all liabilities arising out of specific assets and business shows a "clear and unambiguous intent [to] indemnify . . for all liabilities" including CERCLA liabilities); Purolator Products Corp. v. Allied-Signal, Inc., 772 F.Supp. 124, 131 (W.D.N.Y. 1991) (finding under New York law that indemnity provisions are broad enough to encompass CERCLA liability related to transferred assets where the agreement states that the plaintiff "assumes and agrees to satisfy all liabilities and obligations of [defendant] relating to or arising out of the Assets").

Rhodia argues that Section 2.1 does not apply to claims between the parties to the ACA. The Court is not convinced.  Rhodia's argument relies heavily on Hooper Assoc., Ltd. v. AGS Computers, Inc., 74 N.Y.2d 487 (N.Y. 1989), a case construing an indemnity clause as not encompassing counsel fees.  Hooper involved a provision that obligated the defendant to "'indemnify and hold harmless [plaintiff] from any and all claims, damages, liabilities, costs and expenses, including reasonable counsel fees' arising out of breach of warranty, claims, the performance of any service to be performed, the installation, operation and maintenance of the computer system, infringement of patent, copyrights or trademarks and the like."  Strictly construing the contract, the Hooper court stated that "[a]ll these subjects are susceptible to third-party claims for failures in the installation or operation of the system.  None are exclusively or unequivocally referable to claims between the parties themselves or support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract."  Id. at 492.  Therefore, the court found that the agreement did "not contain language clearly permitting plaintiff to recover from defendant the attorney's fees incurred in a suit against defendant."  Id.

18

Hooper did not involve an agreement to assume liabilities or a release and therefore is not controlling.  As described above, the agreement to assume liabilities in Section 2.1 should be viewed as a release.  New York law requires that it be "construed most strongly against the releasor," here, Rhodia.   On the other hand, an indemnity agreement must be strictly construed against the indemnitor, here, Bayer.  Moreover, the language in Section 2.1 states that Rhodia shall assume . . . all of the liabilities and obligations of RPI relating to the Acquired Assets . . . . including, *without limitation*, the following."  ACA at 8 (emphasis added).  The indemnification provision analyzed in Hooper required that the defendant "indemnify and hold harmless [the plaintiff] from any and all claims, damages, liabilities . . . including reasonable counsel fees arising out of."  The Hooper court concluded that the listed subjects of indemnification did not "support an inference that defendant promised to indemnify plaintiff for counsel fees in an action on the contract."  74 N.Y.2d at 492.  On the other hand, here, the "without limitation" clause indicates that the subjects listed in Section 2.1 were not meant to be a limitation on Rhodia's agreement to "assume . . . all of the liabilities and obligation of RPI relating to the Acquired Assets."  See Purolator Products, 772 F. Supp. at 131-32 (finding that a provision listing particular lawsuits did "not mean that the indemnity agreement only applied to those actions" where the provision stated that the list was provided "[w]ithout limiting the generality" of the indemnification).

For the above reasons, the Court will grant defendant Bayer's motion to dismiss the CERCLA and federal common law contribution claims.  The Court need not consider Bayer's additional arguments regarding these claims.

**b.     Section 2.1 of the ACA Does Not Encompasses Rhodia's**

19

**Negligence Claims.**

Despite the broad language of the assumption agreement in Section 2.1, it does not encompass Rhodia's negligence claims.[14]  Under New York law, "agreements to release parties from 'any and all responsibility or liability of any nature whatsoever' do not bar claims based on ordinary negligence." Delaney v. City of Mount Vernon, 28 A.D.3d 416, 417 (N.Y. App. Div. 2006); see also Trummer v. Niewisch, 17 A.D.3d 349, 349-350 (N.Y. App. Div. 2005) ("agreements to release from 'any and all responsibility or liability of any nature whatsoever for any loss of property or personal injury' will not bar claims based on negligence") (citations omitted); see also Alexander v. Kendall Cent. School Dist., 221 A.D.2d 898, 899 (N.Y. App. Div. 1995) (refusing to enforce general release that did not "plainly and precisely" limit the liability of defendant for his own negligent conduct).  The New York Court of Appeals recognized that the "general rule of strict judicial construction [regarding release of negligence claims] has been somewhat liberalized in its application to exoneration clauses in indemnification agreements, which are usually 'negotiated at arm's length between . . . sophisticated business entities' and which can be viewed as merely 'allocating the risk of liability to third parties between themselves, essentially through the employment of insurance.'" Gross v. Sweet, 400 N.E.2d 306, 310 (N.Y. 1979).

The Complaint alleges that at the time the ACA was executed, both Rhodia and Bayer's predecessor RPI were "controlled" by RPSA.  Compl. ¶¶ 5, 11, 25.  Thus, the Court cannot conclude that the general rule is liberalized here.  At this stage in the litigation, the Court cannot

---

[14]This section applies to Rhodia's claim for common law negligence.  It also applies to Rhodia's claim for common law indemnity to the extent it is based on the alleged negligence.

conclude that under New York law,  Section 2.1 or Section 7.3 "plainly and precisely" limit

Bayer's liability for negligence.  Therefore, the Court rejects Bayer's release argument with

respect to the negligence claims.

### 3. Common Law Negligence and Indemnification.

Bayer makes two additional arguments regarding the common law claims.  First, Bayer

argues that CERCLA preempts both of the asserted common law theories.  Second, Bayer argues

that the "economic loss doctrine" requires the dismissal of the common law negligence claim.

The Court disagrees on both points.

### a. CERCLA Preemption

Bayer argues that the Third Circuit decision in In the Matter of Reading Co., 115 F. 3d

1111 (3d Cir. 1997) requires dismissal of the common law claims.  Reading involved a plaintiff

who was sued by the United States under CERCLA § 107(a).  The plaintiff, in turn, sued the

defendant for common law contribution and restitution.  The Reading court declared that

CERCLA was "an elaborate settlement scheme aimed at the efficient resolution of environmental

disputes" and concluded that "[p]ermitting independent common law remedies would create a

path around the statutory settlement scheme, raising an obstacle to the intent of Congress."  Id. at

1117.  The Reading court concluded that the state common law claims of contribution and

restitution created an "actual conflict" with the "remedies expressly provided in the statute" and

therefore the common law claims were "preempted by CERCLA § 113(f)."  Id.

Rhodia contends that the Supreme Court opinion in Cooper Industries, Inc. v. Aviall

Services, 543 U.S. 157 (2004) requires this Court to permit contribution actions outside of the §

113 context.  The last sentence of § 113(f)(1) provides that "[n]othing in this subsection shall

diminish the right of any person to bring an action for contribution in the absence of a civil action

[under CERCLA § 106 or § 107,].”  The <u>Cooper Industries</u> Court stated that this provision

“rebuts any presumption that the express right of contribution provided by the enabling clause [of

§ 113(f)(1)] is the exclusive cause of action for contribution available to a PRP.”  <u>Id.</u> at 166-67.[15]

The Court also noted that the provision “does not itself establish a cause of action . . . nor does it

specify what causes of action for contribution, if any, exist outside § 113(f)(1).”  <u>Id.</u> at 167.

The Complaint does not allege that Rhodia has settled any CERCLA related liabilities, or

been sued under any CERCLA provisions.  The Complaint alleges only that administrative

actions were taken against Rhodia pursuant to other statutory schemes.  The Court concludes that

any common law contribution rights relating to these administrative actions might not be wholly

preempted by CERCLA § 113(f).  This is consistent with <u>Reading</u> and <u>Cooper</u>.  <u>Cooper</u> prevents

an interpretation under which § 113(f)(1) would be the only method by which a PRP can gain

contribution for environmental costs.  <u>Reading</u>, read properly, is consistent with this requirement,

as it acknowledges that contribution can be gained through the other CERCLA subsections (e.g.

§ 113(f)(3)).  115 F.3d at 1119.  Moreover, <u>Reading</u> is silent on whether contribution is available

to a party that has neither settled CERCLA liabilities nor been sued under CERCLA.

The Court concludes that to the extent that Rhodia’s claims for common law negligence

and indemnification are, in fact, claims for common law contribution or restitution based on

potential or actual CERCLA liability, they would be preempted.  This determination would

involve a factual inquiry into the scope and nature of the environmental damage.  Therefore, the

---

[15]PRP stands for “potentially responsible party,” a CERCLA term of art referring to parties listed in CERCLA § 107(a)(1)-(4) that may be liable for cleanup costs pursuant to the statute.

claims for common law negligence and indemnification will not, at this time, be dismissed as preempted.

### b.      The Economic Loss Doctrine

Bayer also argues that Rhodia's common law negligence claims are "not viable" because "it is well-settled that the economic loss doctrine precludes recovery in tort under negligence theories for economic loss."  Bayer Br. at 23.  Bayer claims that the "economic loss doctrine" should be applied to preclude negligence claims related to sales of contaminated real estate.  Id. Rhodia counters that the negligence claim falls within a "clear exception to the economic loss rule" because it involves damage to property other than the Silver Bow Site.  Pl. Br. at 37 (citing Compl. ¶ 19).  In their reply brief, Bayer asserts that the Court should apply the "integral system/relationship" test and find that the alleged off-site contamination cannot constitute other property for the purposes of the economic loss rule.  Bayer Reply Br. at 37-38.

The Complaint alleges that hazardous substances were detected at "multiple locations in and around" the Silver Bow Site.  Compl. ¶ 19.  The Court must take the facts pled in the Complaint as true.  The Court will not now determine whether the alleged contaminated property, in fact, constitutes "other property." Therefore, the Court will not now dismiss the negligence claim on this ground.

### C.      Rhodia's Motion for Partial Summary Judgment

As discussed in Section II.B. above, Rhodia assumed the alleged CERCLA liabilities of Bayer relating to the Silver Bow Site.  Rhodia's claims for declaratory relief is based on the alleged CERCLA liability.  Compl. ¶ 51.  Therefore, Rhodia has not demonstrated that it is entitled to a judgment as a matter of law on its claim for declaratory judgment.  The Court denies

Rhodia's motion for partial summary judgment.[16]

## III.   CONCLUSION

For the foregoing reasons, the Court will: (1) grant Aventis and Sanofi's motion to compel arbitration; (2) grant in part and deny in part Bayer's motion to dismiss; and (3) deny Rhodia's motion for partial summary judgment.  The case will be stayed pending resolution of the issues referred to arbitration.


Dated: November 5, 2007


                                               ___ s/ Garrett E. Brown, Jr._____
                                               GARRETT E. BROWN, JR., U.S.D.J.

---

[16]Rhodia argues that § 7.3 of the ACA, "cannot be read to apply 'exclusively or unequivocally' to claims between the parties themselves" because Bayer previously submitted third party claims to Rhodia.  Pl. Reply Br. at 12 & n.5.  This does not alter the Court's decision based on § 2.1 of the ACA.